At about 10 o'clock on the night of October 5, 1941, at the corner of Vallette and Homer Streets in Algiers — that part of the City of New Orleans on the west bank of the Mississippi River — there was a collision between a taxicab and a privately owned automobile. Mr. and Mrs. Douglas Braai were standing on the sidewalk near the curb on the southwest corner of that intersection and both sustained severe physical injuries when they were struck by the taxicab which, as a result of the impact, either ran or was knocked upon the sidewalk where they stood. The taxicab was owned by Frank Smith who conducted his business under the trade name "Smitty Cab Company." Independent Cab Operator's Association, as an insurer of the liability of taxicabs, had furnished to Smith a public liability bond as required by Municipal Ordinance 13825 C.C.S., as amended, and under this bond the Independent Cab Operator's Association agreed to guarantee payment *Page 44 
of any judgment secured by any person against the said Smith for injuries caused by any of his taxicabs, and it is conceded that if Smith is liable that company should also be cast in damages.
The private automobile, which was owned by Patrick Adams, was being operated at the time by his son, Ralph Adams, who resided with him and who was under 21 years of age.
Mr. and Mrs. Braai, alleging that they were "in no position to ascertain the facts leading up to the collision," nevertheless charged that it had resulted from the negligence of both Ralph Adams and Michael Danhauer, the operator of the taxicab, and prayed for judgment against Frank Smith, the Independent Cab Operator's Association, Ralph Adams and Patrick Adams, averring that the last named defendant was liable because of the fault of his minor son who, it was alleged, resided with him.
Neither Ralph nor Patrick Adams filed answer but the other two defendants, Smith and his insurer denied all liability on their part, asserted that the accident had been caused solely by the negligence of Ralph Adams, and asked that the suit as against them be dismissed.
The Board of Administrators of the Charity Hospital of Louisiana at New Orleans intervened, averring that it had rendered hospital treatment and had furnished drugs, medicine and X-ray services to plaintiffs valued at $69, and that in the event of judgment in favor of plaintiffs it, the said Board of Administrators of the said Hospital should be entitled to judgment against both plaintiffs and defendants for $69, with interest from judicial demand and for 10% attorney's fees.
There were judgments dismissing the suit as against Patrick Adams but against all other defendants, solidarily, in favor of Mrs. Braai for $3,000 with 5% interest from judicial demand, in favor of Mr. Braai, individually and as head of the community for $3,000 with 5% interest from judicial demand, and in favor of Charity Hospital of Louisiana at New Orleans and against both plaintiffs, Frank Smith, Independent Cab Operator's Association and Ralph Adams for $69, with legal interest from judicial demand and with 10% attorney's fees.
Frank Smith and Independent Cab Operator's Association have appealed suspensively and devolutively, and Mr. and Mrs. Braai have answered the appeal praying that the awards in their favor be increased to the amounts respectively originally prayed for. Judgment was not rendered against Patrick Adams because on the trial it was shown that though his son, Ralph, who was operating the car had not reached the age of 21 years, he had been married sometime prior to the accident and that by that marriage he had been emancipated. A father is responsible for the torts of his minor child residing with him only so long as that child remains "unemancipated." C.C. art. 2318.
Since Mr. and Mrs. Braai were on the sidewalk and had no means of getting out of the way of the taxicab, it is plain that they should recover from either or both groups of defendants.
Vallette and Homer Streets cross at a right angle. Vallette Street is paved — Homer is not. The taxicab was going west on Homer Street and the Adams car was going south on Vallette Street. There was a seven board wood fence paralleling Homer Street on the south side of the residence which is located on the northeast corner and this fence, to some extent, impeded the view of both drivers.
As to Adams, plaintiffs allege that he was negligent in operating his father's car in excess of 20 miles per hour, in failing to keep it under control; in failing to maintain a lookout for cars approaching from other directions; in not reducing speed upon approaching the intersecting street, and in not stopping on noticing the cab coming into the intersection. They charge Danhauer, the driver of the cab, with the following specific acts of negligence: That he drove the cab carelessly and failed to keep it under control and to keep a lookout for other cars approaching the intersection; that he drove it in excess of 20 miles an hour on an unpaved street, and that he failed to yield the right of way to the Adams car which was approaching from his right, and which, therefore, under the provisions of Article 6, par. 10, sub-paragraph (a), was entitled to the right of way; and that he was also negligent in failing to reduce the speed of his vehicle and, in fact, in not coming to a complete stop upon approaching the paved thoroughfare, since his view was obstructed.
Danhauer, the driver of the cab, says that when the cab reached the corner of Vallette Street he brought it to a stop and blew his horn for one minute; that he then *Page 45 
looked to his right and saw the Adams car about three-quarters of a block away coming at a speed which led him to believe that he could cross in safety. He says that he had no way of estimating the speed accurately and that it might have been travelling at a high rate. At this point we may say that since the accident occurred at night, Danhauer could not see the Adams car itself and could judge its speed only by looking at its lights as the car approached him.
We think that the record shows that the Adams car was not travelling at a rate of speed which was grossly excessive. Danhauer says that "the Adams car stopped immediately." Counsel asked him if it did not proceed about 5 feet after striking him, and he answered: "No, where he hit me is where he stayed. He stopped right where he hit me." And when asked if he was sure of this, he said: "I am positive."
Adams says that as he approached the corner he was driving at about 20 or 25 miles an hour, and Miss Lange, when asked what she thought was the speed of their car, said:
"I don't think any more than 20 or 25 miles an hour."
As we have said, the corner across which the two drivers looked to see each other is such a corner as is commonly characterized as a blind one. City Traffic Ordinance No. 13702 in Article 7, Section 9, sets forth the conditions under which it shall be deemed that the view of an automobile operator is obstructed:
"* * * An operator's view shall be deemed to be obstructed when at anytime during the last fifty feet of his approach to such intersection, he does not have a clear and uninterrupted view of such intersection and of the traffic upon all of the streets entering such intersection for a distance of one hundred (100) feet from such intersection."
Danhauer says that until he reached a point five feet from Vallette Street he could not look to his right up that street. Mr. Braai says that he knows what is meant by the term "blind corner"; that this term means "where there is a fence or a bunch of bushes or shrubbery * * *" and that he would consider this such a corner. When Adams was asked whether the view across that corner was obstructed, he said:
"Well, it is kinder blocked off like you see. The houses is right up on the corner line and he would have to be out a good way for me to see him."
The Traffic Ordinance provides that at such a corner the operator of a vehicle on an unpaved street shall bring his vehicle to a stop. In Article 7, paragraph 9, appears the following:
"Every operator of a vehicle traveling upon any unpaved street intersecting any paved street shall bring such vehicle to a full stop at the place where such street meets the prolongation of the nearest property line of such paved street, when the operator's view is obstructed, * * *"
In spite of the statement of Danhauer that he stopped and looked, and that he blew his horn for "one minute", the record convinces us that he took none of these precautions. Had he stopped or had he even substantially reduced the speed of his vehicle he could not have failed to realize the danger of entering immediately in front of the approaching Adams' car. Since the speed of the Adams car was moderate, it could not have been three-quarters of a block away as Danhauer says it was, and must have been not much further away than his own car was when he looked, if he had looked at all.
The occurrence of the accident indicates that neither driver looked for traffic on the other street and that had either stopped at the blind corner and looked, or had either substantially reduced his speed and looked, he would have seen the other car and would have avoided the crash. Both were at fault in not doing so. There was joint negligence and there is therefore solidary liability.
Mr. Braai sustained two fractures of his right arm, one at the lower end of the radius and the other at the styloid process of the ulna. He also suffered from lacerations of the scalp. The fractures healed properly and, some six weeks or so after the injury, X-ray photographs showed that they were in good position and alignment. He lost about three weeks earnings as a result of disability. The lacerations of his scalp necessitated about thirty-five stitches. He suffered pain for about a month and a half. Because of the fractures, his arm was placed in a cast which remained on for about five weeks.
It was at first thought that Mrs. Braai had sustained a skull fracture but X-ray photographs showed that she had escaped this. Her left hand sustained three *Page 46 
fractures, one in the middle third of the third metacarpal bone, one in the middle third of the fourth metacarpal bone and a fracture in the proximal portion of the first phalanx of the second finger. Her right hand sustained a comminuted fracture at the lower end of the radius. Her left hand was placed in a cast where it remained for about five weeks and her right arm remained in a cast for about six weeks. She sustained brush burns on the left side and shoulder and on her knees, ankles and face. Seven stitches were required near her left eye.
The amount allowed each of the plaintiffs was $3,000. These multiple injuries justify the amounts awarded.
The judgment appealed from is affirmed at the cost of appellant.
Affirmed.